UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | Case No. 7:21mj8 |
| | ) | |
| The real property located at: | ) | |
| | ) | **FILED UNDER SEAL** |
| 1765 Otter Drive, Ferrum, Virginia, 24088 | ) | |
| | ) | |
| 1775 Scuffling Hill Road, | ) | |
| Rocky Mount, Virginia, 24151 | ) | |
| | ) | |
| | ) | |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

### Introduction

Your affiant, Kathryn Camiliere, being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since May 1, 2016. I have a Bachelor's Degree from the United States Military Academy, and a Master's Degree from King's College in London. I have extensive training and experience in the areas of terrorism investigations and white collar crime, as well as interview and interrogation techniques, evidence recovery, source recruitment, and cellular phone analysis.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. This affidavit is made in support of an application for a search warrant for the following locations (hereinafter "**SUBJECT RESIDENCES**"):

    a. **1765 Otter Drive, Ferrum, VA, 24088 (SUBJECT RESIDENCE A) (Home of Thomas Robertson)** which is further described and depicted in Attachment A, as a one story brick family home, as observed during physical surveillance. The items to be searched and seized are described in the following paragraphs and in Attachment B.

    b. **1775 Scuffling Hill Road, Rocky Mount, VA, 24151 (SUBJECT RESIDENCE B) (Home of Jacob Fracker),** which is further described and depicted in Attachment A. The items to be searched and seized are described in the following paragraphs and in Attachment B.

4. Based on my training and experience and the information set forth herein, your Affiant has probable cause to believe that THOMAS ROBERTSON and JACOB FRACKER ("defendants") engaged in violations of 18 U.S.C. § 1512(c), 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e) in connection with their activity at the U.S. Capitol on January 6, 2021, and that evidence, fruits and instrumentalities related to these violations, (as further described in Attachment B), may be found at the **SUBJECT RESIDENCES**.

5. This affidavit is based upon information that I have gained from my investigation, my training and experience, as well as information gained from conversations with other law enforcement officers. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities (more precisely described in Attachment B) of violations of 18 U.S.C. § 1512(c), 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e) are located at the **SUBJECT RESIDENCES** (as further described in Attachment A).

2

6. This investigation involves evidence, fruits, and instrumentalities of offenses which are located within the jurisdiction and proper venue of the United States District Court for the Western District of Virginia, as more fully articulated herein.

## Pertinent Federal Criminal Statutes and Definitions

7. This investigation concerns alleged violations of:

   a. 18 U.S.C. § 1752(a), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; (3) knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, obstruct or impede ingress or egress to or from any restricted building or grounds; or (4) knowingly engage in any act of physical violence against any person or property in any restricted building or grounds; or attempts or conspires to do so. For purposes of Section 1752 of Title 18, a restricted building includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

   b. 40 U.S.C. § 5104(e)(2), which makes it a crime for an individual or group of individuals to willfully and knowingly (A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House; (B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House; (C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of— (i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of  Congress; or (ii) the Library of Congress; (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of

Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; (E) obstruct, or impede passage through or within, the Grounds or any of the Capitol Buildings; (F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings; or (G) parade, demonstrate, or picket in any of the Capitol Buildings; and

c. 18 U.S.C. § 1512(c), which makes is it a crime to corruptly (1) alter, destroy, mutilate, or conceal a record, document, or other object, or attempt to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstruct, influence, or impede any official proceeding, or attempt to do so.

## Probable Cause

### The Riots at the U.S. Capitol

8. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

9. On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

10. As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

11. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

12. At such time, the certification proceedings still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

13. Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances

caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

14. During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

15. According to information the FBI has reviewed, after 2:00 p.m., but before the joint session of Congress resumed at 8:00 p.m., the defendants Thomas Robertson and Jacob Fracker were photographed in the Capitol Building making an obscene statement in front of a statute of John Stark. At the time they were photographed, the defendants were off-duty from their positions as police officers with the Rocky Mount Police Department in Rocky Mount, Virginia.

16. In social media posts, Defendant Robertson is quoted as saying, "CNN and the Left are just mad because we actually attacked the government who is the problem and not some random small business ... The right IN ONE DAY took the f***** U.S. Capitol. Keep poking us." He also stated that he was "proud" of the photo in an Instagram Post that was shared to Facebook, because he was "willing to put skin in the game."

17. A now-deleted Facebook post by Defendant Fracker containing the caption, "Lol to anyone who's possibly concerned about the picture of me going around... Sorry I hate freedom? …Not like I did anything illegal…y'all do what you feel you need to…."

18. In a statement to Newsweek, Defendant Robertson admitted that he and Defendant Fracker sent the photo to their police department colleagues, and after it was leaked to social media he reposted it on his own Facebook page. It has also been reported that Robertson stated that he broke no laws, did not know about the violence, and that he had been escorted "in" by the Capitol Police. Robertson made these claims notwithstanding his previous posts that he had "attacked the government" and "took the f**** Capitol." Moreover, at that date and time, the United States Capitol was on lockdown and the defendants' presence inside was without lawful authority.

### The Defendants' Arrest and Additional Probable Cause

19. Based on the foregoing, a Magistrate Judge in the District of Columbia found probable cause that Thomas Robertson and Jacob Fracker committed violations of 18 U.S.C. § 1752, and 50 U.S.C. § 5104, and an arrest warrant issued. They defendants were taken into custody on Wednesday, January 13, 2021, in the Western District of Virginia, and were released subject to certain conditions, including a ban from any public protest or demonstration anywhere.

20. At the time of their arrest, the defendants' cell phones, used to take photos and video while at the U.S. Capitol, were not located on their person or in their cars.

21. Following the defendants' arrest, I reviewed additional footage from the U.S. Capitol, and observed Jacob Fracker wearing a gas mask. The gas mask was not on his person when he was taken into custody. During the riots, Jacob Fracker was wearing a black hooded

sweatshirt, and Thomas Robertson appears to be wearing a black jacket. Neither the black jacket, nor the black sweatshirt were on Robertson or Fracker's person when they were taken into custody.

22. Also on Wednesday, January 13, 2021, a Magistrate Judge in the District of Columbia issued a search warrant for the defendant's Facebook accounts, finding probable cause that they contained evidence of violations of 18 U.S.C. § 1752 and 40 U.S.C. § 5014.

23. A review of the material obtained from Facebook showed that: On January 7, 2021, Fracker sent a photo and multiple videos to a friend on Facebook. The photo depicted Fracker, dressed in a black sweatshirt with an American flag on the left side, standing in front of a statue which was holding a "Trump 2020, Make America Great Again" flag. After sending the photo but before sending the videos, Fracker told his Facebook friend "Don't share these. Just thought you should know there's hitter out here trying to make a fucking difference at any cost." The first video (Video 1) appears to depict Fracker (wearing a black sweatshirt with an American flag on the left side) wearing a gas mask inside of the US Capitol building. Turning the camera towards himself, Fracker hits his chest multiple times. Fracker tells his Facebook friend "Shit was wild lol I pissed in Nancy P's toilet."

24. The second video (Video 2) appears to be taken on the lower levels outside of the Capitol. Fracker again towards the camera towards himself and can be seen wearing the same gas mask as in Video 1. While holding the camera (not facing himself), the person I believe to be Fracker moves up the steps of the Capitol and past a barrier. At approximately 2:13 seconds into the video, the person I believe to be Fracker yells "Let's fucking go!" Video 3 is taken within the Capitol. Fracker again turns the camera towards himself, and he can again be seen wearing a

8

black sweatshirt with an American flag on the left side, as well as a gas mask. In the background, one can clearly hear someone within the crowd yelling "PELOSI!"

25. After sending Video 3, Fracker tells his Facebook friend "We did hahaha it was fucking amazing. Flash bangs going off, CS gas, rubber bullets flying by. Felt so good to be back in the shit hahaha I was like 8th person inside the building, shit was fuckin LIT." Later in the conversation with the same Facebook friend, Fracker states "I haven't been that hyped up since fuckin Nowzad hahaha." From my experiences in Afghanistan, I am aware that Nowzad is a town within Nawzad District, Helmand Province, Afghanistan. I believe that Fracker was comparing his experiences in the Capitol with his time in Afghanistan. On January 7, 2021, Fracker replied to a comment made by a friend "Freedom 2020. Fuck commies. Fuck tyranny. And fuck anyone in the way of a free America."

26. On December 19, 2020, Robertson commented on Facebook "Civility has left me. Im tired of always taking the high road and being beat by those who cheat, lie, and steal to win and then allow their media to paint me as the bad guy. I won't be disenfranchised. I'll follow the path our founders gave us. Redress of grievances (already done) civil disobedience (here now) and then open armed rebellion. I've spent the last 10 years fighting an insurgency in Iraq and then Afghanistan. Im prepared to start one here and know a bunch of like minded and trained individuals." On December 29, 2020, Robertson commented on a post "Amen. The time is upon us to remind our government where their power is derived from." On January 4, 2021, Robertson comments on a Facebook post "Ill be in DC Wednesday to peacefully protest, the day after….we shall see."

9

27. On January 7, 2021, Robertson messaged whom I believe to be a close blood relative Facebook. Robertson tells his relative "Safe at home. Bumps bruised and eyes sore from tear gas but good! Love you!"

28. On January 8, 2021, Robertson comments on a post "Well.....Fuck you. Being nice,polite,writing letters and sending emails hasn't worked. Peaceful protests haven't worked. Millions of FB posts,tweets,and other social media hasn't worked. All thats left is violence and YOU and your "Friends on the other side of the isle" have pushed Americans into that corner. The picture of Senators cowering on the floor with genuine fear on their faces is the most American thing I have seen in my life. Once....for real....you people ACTUALLY realized who you work for." Also on January 8, Robertson comments "Peace is done. Now is the time for all the braggart "Patriots" to buckle armor or shut the fuck up. Facebook warriors time is done. The next revolution started 1/6/21 in case you "Im ready" and "standing by" guys missed it." Again on January 8, Robertson commented in part "The next revolution started in DC 1/6/21. The only voice these people will now listen to is VIOLENCE. So,respectfully. Buckle armor or just stay at home."

29. Furthermore, on January 8, 2021, Robertson replied to a comment in part "Respectfully....I was in Richmond 1/20/20 and I was in the Capitol building 2 days ago. I am a VCDL, NRA member and a serving Soldier and police officer. Damage control by the Republicans in DC is trying to say it was ANTIFA. It wasnt. Possible some were there? Of course. Caused it?? Nope."

30. On January 9, 2021 Robertson messages a Facebook friend with two photos, one of which was described previously (Fracker and Robertson together with Fracker making an

10

obscene gesture), and a second photo looking down what appears to be the steps of the Capitol. Robertson tells his friend "Shot in the ass with a rubber bullet," and then sends a picture with what appears to be a large bruise from a rubber bullet. Robertson goes on to say "We were stomping on the roof of their safe room chanting WHOS HOUSE? OUR HOUSE". On January 10, 2021, Robertson tells a friend on Facebook "I'm going to war. Can't speak for everyone." The friend then asks whether Robertson is being sent "there?" Robertson replies "No. Im going to fight the cocksuckers who stole our country." The friend then asks "Where are you going to between US?" Robertson replies "DC on the 20th for sure." On January 11, 2021, Robertson posted an image with the words "By bullet or ballot restoration of the republic is coming." On January 13, 2021, he told a Facebook friend "I may die but I'll be damned before I strike my colors."

31.     Based on information I have reviewed from Facebook, I know that Thomas Robertson used the following digital devices access social media: An SM-J727R4 running (used to access Facebook on January 11, 2021); a SM-T510 (used to access Facebook on January 7, 2021); and a computer running Windows 10 (used to access Facebook on December 4, 2020).

32.     Based on information I have reviewed from Facebook, I know that Jacob Fracker used an iPhone 12 to access Facebook on January 13, 2021.

### The Subject Residences

33.     Law enforcement database checks confirmed that Defendant Robertson resides at Subject Residence A, and Defendant Fracker resides at Subject Residence B.

34. Robertson has Subject Residence A listed as his home of record on his Driver's License. Fracker self-identifies his shipping address as 1775 Scuffling Hill Rd, Rocky Mount, Va 24151 to a friend on Facebook on January 10, 2021.

35. Given that the Robertson and Fracker (1) knowingly and willfully forcibly entered the U.S. Capitol on January 6, 2021, and carried a gas mask, and cell phone with which they took pictures, and (2) documented their activities using digital devices to access Facebook, your affiant believes that there is probable cause to believe that there exists physical and/or electronic evidence of the commission of the above-described offenses at the SUBJECT PREMISES, including the aforementioned gas mask, digital devices, and clothes the defendants were wearing on January 6, 2021.

36. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a digital device (including a smart phone), a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of digital devices, electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

### Background on Digital Devices and Storage Media

37. I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

38. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

   e. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

   f. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the

14

United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and

15

have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on

    the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   i. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

  39. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

   j. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic

electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

k. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

l. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

40. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

41. Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

### Request for Sealing

42. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

### Conclusion

26. Based on the facts set forth above, your affiant respectfully submits that there is probable cause to believe that **THOMAS ROBERTSON** and **JACOB FRACKER** engaged in violations of 18 U.S.C. § 1512(c), 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e). Furthermore,

there is probable cause that evidence, fruits and instrumentalities of these violations (described with more specificity in Attachment B to this affidavit) are presently located at the **SUBJECT RESIDENCES**, as depicted in Attachment A to this affidavit, including any outbuildings, sheds, garages and/or vehicles that are on the premises.

27. Accordingly, your affiant respectfully requests that the Court issue a search warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure authorizing FBI agents and representatives of the FBI, with assistance from representatives of other law enforcement agencies as required, to search 1765 Otter Drive, Ferrum, Virginia, 24088, and 1775 Scuffling Hill Road, Rocky Mount, Virginia A, 24151 (more precisely described in Attachment A), for evidence, fruits, and instrumentalities (more precisely described in Attachment B).

Kathryn Camiliere
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 18th day of January 2021 via telephone.

Entered: January 18, 2021

Robert S. Ballou
United States Magistrate Judge

SEEN AND APPROVED:
/s Matthew M. Miller_____
Assistant United States Attorney